Carl D. Crowell, OSB No. 982049
email: crowell@kite.com
Crowell Law
P.O. Box 923
Salem, OR 97308
(503) 581-1240
Of attorneys for plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| **SLEP-TONE ENTERTAINMENT CORPORATION** | Case No.: 3:14-cv-00764 |
|---|---|
| Plaintiff, | COMPLAINT |
| v. | TRADEMARK INFRINGEMENT UNFAIR COMPETITION 15 U.S.C. § 1125 |
| **CANTON PHOENIX INCORPORATED**, d/b/a **CANTON PHOENIX**, and **BING PAN ZHU**, an individual. | STATE TRADEMARK LAW COMMON LAW PASSING OFF |
| Defendants. | JURY TRIAL REQUESTED |

Slep-Tone Entertainment Corporation ("Slep-Tone") complains and alleges as follows:

INTRODUCTION

1.      This is an action for infringement of plaintiff's registered trademarks. Plaintiff produces karaoke materials that are used to provide karaoke entertainment services such as in bars and other venues. Prolific counterfeiting and use of counterfeits by numerous parties, including defendants, has caused plaintiff injury for which plaintiff seeks recovery.

JURISDICTION AND VENUE

2.      This is an action for trademark infringement and unfair competition arising under the Trademark Act of 1946, 15 U.S.C. §§ 1114 and 1125.

COMPLAINT – CANTON PHOENIX                                                                                              1

3. This court has exclusive jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States.

4. This court further has jurisdiction pursuant to 28 U.S.C § 1338(a), in that this civil action arises under an Act of Congress relating to trademarks, and, as to the plaintiff's Lanham Act unfair competition claim, pursuant to 28 U.S.C. § 1338(b), in that the claim is joined with a substantial and related claim under the trademark laws of the United States.

5. This court has supplemental jurisdiction over the subject matter of the plaintiff's common law and state law claims pursuant to 28 U.S.C. § 1367(a), in that those claims are so related to the plaintiff's federal claims that they form part of the same case or controversy.

6. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because the defendants place of business is in Tigard, Oregon, which is in this judicial district.

## PARTIES

7. Plaintiff Slep-Tone is a North Carolina corporation having its principal place of business at 12245 Nations Ford Rd., Ste 505, Pineville, North Carolina, doing business nationwide.

8. Defendant CANTON PHOENIX INCORPORATED is an Oregon company with its principal place of business at 14455 SW Pacific Highway, Tigard, Oregon that has registered to do business under the assumed name of CANTON PHOENIX.

9. CANTON PHOENIX is a restaurant and bar in Tigard, Oregon, which offers karaoke entertainment to its customers for its economic benefit.

10. Defendant BING PAN ZHU is an owner and manager of Canton Phoenix who personally controlled the relevant infringing activities with actual knowledge that such were infringing plaintiff's rights.

## THE RIGHTS OF THE PLAINTIFF

11. Plaintiff Slep-Tone is the owner of U.S. Trademark Registration No. 1,923,448 and No. 4,099,045 for the trademark SOUND CHOICE.

12. Plaintiff Slep-Tone is the owner of U.S. Trademark Registration No. 2,000,725 and No. 4,099,052, for a display trademark as follows:



13. Plaintiff Slep-Tone is the registered owner of Oregon State Trademark Registration No. 42675 for the mark SOUND CHOICE, for use with "Entertainment in the nature of karaoke."

14. Plaintiff Slep-Tone has, for the entire time the several Sound Choice marks have been registered, provided the public, including the defendant, with notice of its federal registrations through the consistent display of the symbol ® with its marks as used in commerce.

15. Slep-Tone is the owner of distinctive and protectable trade dress associated with its graphical displays ("the trade dress"). This distinctive and protectable trade dress includes, at a minimum:

   a. the use of a particular typeface, style, and visual arrangement in displaying the lyrics;
   b. the use of particular colors to display lyrics and background colors;
   c. differing colors for male and female singers in duets; and
   d. the use of a particular style in displaying entry cues for singers, namely a series of vanishing rectangles to indicate the cue.

16. The trade dress has been in use continuously and substantially exclusively by Slep-Tone since the onset of production on compact discs more than 20 years ago.

17. The individual and collected elements of the trade dress have acquired secondary meaning as an indicator of Slep-Tone as a source, effectively functioning as a visual trademark.

18. The trade dress serves to distinguish Slep-Tone's tracks from the tracks of its competitors, such that persons who are even minimally frequent consumers of karaoke entertainment services such as those provided by defendants are capable of identifying a particular karaoke track as originating with Slep-Tone simply by examining the trade dress, whether or not the Sound Choice marks are also displayed.

19. The elements of the trade dress represent specific design choices by Slep-Tone; they are but one of many ways to convey the information necessary to permit a karaoke singer to be cued or appropriately supported in his or her performance.

20. Slep-Tone's many competitors are not required to use any element of the trade dress to accomplish the cueing function, and indeed all of Slep-Tone's known competitors are known to use other trade dress in accomplishing the cueing function.

## FACTS COMMON TO ALL CLAIMS

21. The term "karaoke" means "empty orchestra" in Japanese.

22. Karaoke is an entertainment service and entertainment source often offered by bars and other venues to entice customers to enter and remain so that they will purchase drinks or other goods and services allowing the bar or venue to profit.

23. Karaoke entertainment has grown into a multi-million dollar business in the United States.

24. Those who provide the actual karaoke services in bars, restaurants, and other venues are known as karaoke jockeys, karaoke hosts, or karaoke operators and commonly referred to as a "KJ."

25. Karaoke entertainment services typically include providing a KJ for entertaining the assembled crowd for warm-up purposes and organizing the karaoke show by controlling access to the stage, setting the order of performance, and operating the karaoke equipment.

26. Bars and other venues will sometimes have an employee act as KJ and manage the karaoke, or they may elect to hire or allow a third party to provide karaoke services.

27. Third parties who provide KJ services, though often called independent contractors, are generally directed by the venue as to when and where they can work and are at all relevant times subject to the control of the venue as the relevant conduct takes place on site under direct supervision.

28. Karaoke content is generally sold on a compact disk, or CD. A CD plus graphics or MP3 plus graphics ("CDG", "CD+G", or "MP3+G") recordings contain re-created arrangements of popular songs for use as "accompaniment tracks."

29. Slep-Tone sells its product on CDs and marks its compact discs and their associated packaging with the Sound Choice trademarks.

30. Typically, the lead vocal tracks in an accompaniment track are omitted so that a karaoke participant can sing along, as though he or she were the lead singer. In other situations, the lead vocal track by a sound-alike artist might be included, and some formats allow the lead vocal to be selectively muted upon playback so that the accompaniment track may be listened to either with or without the lead vocals.

31. The "graphics" portion of a karaoke recording refers to the encoding of the recording with data to provide a contemporaneous video display of the lyrics to the song, in order to aid the performer.

32. This graphics data is also utilized to mark the accompaniment tracks with the Sound Choice trademarks and to cause the Sound Choice trademarks to be displayed upon playback which is usually presented at the beginning of the track before the song begins and at the end of the track to identify the product and presentation as a Sound Choice product.

33. This graphics data also presents the plaintiff's distinctive trade dress comprising the non-functional elements of changing-color lyrics, singing cues, the particular typeface and layout of the lyrics, and logos and other graphical elements.

34. Karaoke entertainment services also typically include special playback software to organize and present karaoke shows and events.

35. Often the software used for playback will permit the addition of text, graphics or other material, such that it is common for the playback of plaintiff's tracks to present both the Sound Choice marks and for the playback to superimpose a message co-branded with plaintiff's product that may include the name of the bar or establishment, supplemental advertising for specials or events, or other information to be relayed to customers. In this, it is common that plaintiff's trademarks are not only presented without authorization, but also used to co-brand and support direct advertising by a venue.

36. Legitimate karaoke entertainment services purchase equipment and purchase or license compact discs containing accompaniment tracks and charge for the above-mentioned karaoke services.

37. Some karaoke entertainment services copy the accompaniment tracks from compact discs to computer hard drives or other media, an activity known as "media-shifting." In many cases, media-shifting also involves converting the compact disc files to a different format, such as from CD+G format to MP3G format or WAV+G format; this is referred to as "format-shifting." Both

media-shifting and format-shifting involve the creation of near duplicates of the original materials stored on the compact discs.

38. Slep-Tone authorizes media-shifting and format-shifting with respect to those elements it owns or controls, and otherwise tolerates media-shifting and format-shifting, what Slep-Tone refers to as "tolerance of media-shifting" in a one-to-one correspondence, only under very specific conditions.

39. Slep-Tone's conditions for tolerance of media-shifting (and format shifting) include:

   a. that each media-shifted or format shifted track must have originated from an original, authentic compact disc;

   b. that the tracks from the original, authentic compact disc be shifted to one, and only one alternative medium at a time;

   c. that the karaoke entertainment service provider maintain ownership and possession of the original, authentic compact disc for the entire time that the media-shifted or format-shifted tracks are in existence;

   d. that the original, authentic compact disc not be used for any commercial purpose while its content has been shifted; and

   e. that the karaoke entertainment service provider notify Slep-Tone that he or she intends to conduct or has conducted a media-shift or format-shift, and submits to a verification of adherence to Slep-Tone's policy.

40. Media-shifting or format-shifting that occurs outside the conditions of tolerance described above is entirely without authorization or tolerance. Specifically, if the karaoke entertainment service does not maintain the strict 1:1 correspondence of all media-shifted songs matching to an original Slep-Tone disc in their possession at all times, then the authorization to

shift any of the other tracks, even if there are some media shifted tracks and original discs that are in 1:1 correspondence, is denied.

41. Control of media-shifting and format shifting further preserves brand integrity for the Sound Choice brands and direct media-shifting from an authorized source generally results in a higher quality playback, whereas counterfeits downloaded or transferred from secondary, tertiary or more removed sources often accumulate playback defects, have compressed and degraded audio or video quality, and can fail to maintain the quality of original legitimate Sound Choice brand products.

42. A karaoke accompaniment track that exists outside the conditions of tolerance described above and that has been marked with Slep-Tone's federally registered trademarks or distinctive trade dress, even without a degradation is a counterfeit or strict counterfeit.

43. A common factor in enticing customers is the size of the catalog of songs available for customers to choose from, the more songs available, the more desirable a venue or karaoke event, thus there is an incentive for venues and KJs to have as many songs as possible and there is value in presenting as large a catalog as possible even if not all songs are commonly played.

44. Typically a karaoke entertainment service will maintain a catalog of songs available for performance, including near duplicate versions of songs marked with the plaintiff's marks, in order to aid participants in selecting a song to sing. Again, the larger the catalog, the more desirable a venue or karaoke event.

45. Thus there is an economic incentive and advantage for venues and KJs to acquire as many tracks as possible, including counterfeit tracks branded with plaintiff's trademarks.

46. While many strict counterfeits are virtually indistinguishable from the original, the counterfeiting of Sound Choice product has become so wide-spread that select counterfeit tracks

known to have format-shifting errors have been re-copied and re-distributed to the extent that certain tracks with format-shifting errors and visible degradation may be found in the production of karaoke performances nationwide, presenting a clearly inferior and degraded product and service as branded with the Sound Choice mark.

47. Whether by an identical strict counterfeit, or a degraded media-shifted counterfeit, customers are deceived by the presentation of an unauthorized product and service bearing plaintiff's registered trademarks.

48. For each of the several most recent releases of new karaoke music by Slep-Tone, on average dozens of illegitimate copies of the contents of the disc have been created for each legitimate copy sold. Slep-Tone, and its licensors have lost a considerable amount of money due to this widespread counterfeiting.

49. Widespread counterfeiting of Slep-Tone product has contributed to the loss of more than seventy jobs as well as several consecutive years of operating losses, as revenues do not cover fixed costs.

50. The widespread creation and use of counterfeit copies of Slep-Tone's karaoke discs and software has caused Slep-Tone injury and denied Slep-Tone the benefit of its investments.

51. Legitimate karaoke entertainment service providers spend thousands of dollars acquiring Slep-Tone's accompaniment tracks, an irreducible overhead cost that must be recovered over a significant number of engagements.

52. Illegitimate karaoke entertainment service providers who maintain counterfeit product in their libraries have an unfair advantage over legitimate karaoke entertainment service providers because the illegitimate karaoke entertainment service providers are able to provide karaoke

services with a considerably lower overhead cost and significantly more songs through the use of counterfeits.

53. Counterfeit piracy therefore unfairly increases the profits of illegitimate karaoke entertainment service providers and unfairly decreases the profits of legitimate karaoke entertainment service providers, a condition that pressures legitimate karaoke entertainment service providers to either commit piracy instead of doing business with Slep-Tone and other karaoke music producers or lose their shows or their patrons to illegitimate karaoke entertainment service providers offering more songs at cheaper prices to the same venues.

54. Because of counterfeit piracy, without Slep-Tone's enforcement efforts it would be nearly impossible for legitimate karaoke entertainment service providers to compete against illegal karaoke entertainment service providers, who are able to provide less expensive karaoke services and a greater number of tracks due to their lower overhead costs.

DEFENDANTS' CONDUCT

55. Upon information and belief, and based upon investigation of their activities within six months of filing of this complaint, the defendants were in possession of and regularly utilized in excess of 24,000 counterfeit karaoke accompaniment tracks which are marked with Slep-Tone's registered trademarks, or which carry Slep-Tone's distinctive trade dress, or both.

56. Defendants have used and benefited from the use of counterfeit accompaniment tracks marked with the plaintiff's registered trademarks and/or distinctive trade dress for commercial purposes – to wit, to provide karaoke entertainment services to or for the benefit of their customers.

57. Defendants have possessed, used, authorized and benefited from the use of counterfeit goods bearing the Sound Choice marks, plaintiff's trade dress, or both, without authorization,

tolerance from, or notice to the plaintiff, and has provided, advertised, or authorized or benefited from the provision of services in connection with the Sound Choice marks, plaintiff's trade dress, or both.

58. Defendants, directly or through their agents promoted providing karaoke services with thousands of songs available for customers.

59. On information and belief, defendants presented thousands of songs branded with the Sound Choice marks.

60. Neither defendants, nor their agents had a license to use the Sound Choice marks for the counterfeit products used.

61. Defendants' acts of infringement are of a commercial nature, in that they engaged in the acts with the transfer of money or other things of value from one party to another as the principal motivation for providing the services.

62. The activities of defendants were not isolated or sporadic occurrences, but were instead regular activities undertaken over a long period of time.

63. Defendants knew they were obtaining, benefiting from, and using counterfeit karaoke tracks for their economic gain and on notice of such from plaintiff, yet continued to provide such services, to wit: Defendants, including BING PAN ZHU personally, previously contacted plaintiff related to an inquiry for the purchase of karaoke disks from plaintiff. Defendants were informed of plaintiff's media shifting policy yet continued to exploit a catalog of over 24,000 counterfeit tracks.

## DAMAGES

64. The defendants' conduct and unauthorized use of the Sound Choice marks has damaged the plaintiff in an amount of at least $10,000.

## FIRST CLAIM

## TRADEMARK INFRINGEMENT

65.    Plaintiff re-alleges paragraphs 1 through 64.

66.    Defendants used, authorized and directly benefited from the use of a reproduction, counterfeit, or copy of the Sound Choice marks in connection with the provision of services including karaoke entertainment services by using and displaying the reproduction, counterfeit, or copy of the Sound Choice marks during the provision of those services.

67.    Defendants' use of the Sound Choice marks was "in commerce" within the meaning of the Trademark Act.

68.    Plaintiff did not license defendants to manufacture or acquire reproductions, counterfeits, or copies, or to use the Sound Choice marks in connection with the provision of karaoke entertainment services.

69.    Defendants' use of the Sound Choice marks was likely to cause confusion, or to cause mistake, or to deceive customers and patrons into believing that the defendants' services were being provided with the authorization of the plaintiff and that the defendants' music libraries contain *bona fides* legal and licensed Sound Choice accompaniment tracks.

70.    On information and belief, defendants used the Sound Choice marks in conjunction with co-branding of their own establishment, attaching the Sound Choice marks to promotions for their business.

71.    The acts of defendants were willful and with express notice.

72.    Unless enjoined by the court, the defendants' infringing activities as described above may continue unabated and would continue to cause harm to the plaintiff.

## SECOND CLAIM

## UNFAIR COMPETITION – 15 U.S.C. § 1125(A)

73. Plaintiff re-alleges paragraphs 1 through 64.

74. On multiple occasions defendants displayed the Sound Choice marks in connection with the defendants' presentation of karaoke entertainment services.

75. On information and belief, defendants used the Sound Choice marks in conjunction with co-branding of their own establishment, attaching the Sound Choice marks to promotions for their business.

76. The display of the Sound Choice marks is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that Slep-Tone sponsored or approved the defendants' services and commercial activities.

77. The display of the Sound Choice marks is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by Slep-Tone and legally purchased by defendants.

78. Defendants' use of the Sound Choice marks in this fashion would have inured to the benefit of the plaintiff if defendants had legitimately acquired genuine Sound Choice discs instead of counterfeiting them or acquiring counterfeit copies, in that the plaintiff would have received revenue from such sales.

79. Defendants' use of counterfeit Sound Choice marks has further impaired the ability of legitimate providers of karaoke entertainment services from providing and producing shows and

impaired legitimate customers of plaintiff from being able to compete, profit and purchase plaintiff's products.

80. Because Slep-Tone has been denied this revenue, it has been damaged by the defendants' illegal activity.

81. Unless enjoined by the court, the defendants' unfair competitive activities as described above may continue unabated and will continue to cause harm to the plaintiff.

THIRD CLAIM

STATE TRADEMARK LAW

82. Plaintiff re-alleges paragraphs 1 through 81 above.

83. Plaintiff's trademark SOUND CHOICE has been registered with the State of Oregon, Reg. No. 42,675, and plaintiff has rights and recoveries available to it pursuant to ORS §§ 647.005, et seq.

84. Pursuant to ORS § 647.105, plaintiff is entitled to an injunction against the use or display of an imitation or counterfeit of plaintiff's mark, and treble damages in the form of disgorgement of all profits and damages suffered by plaintiff together with the destruction of all counterfeits and imitations of plaintiff's mark.

85. Pursuant to ORS § 647.105(2) plaintiff is entitled to reasonable attorney fees.

FOURTH CLAIM

COMMON LAW PASSING OFF

86. Plaintiff re-alleges paragraphs 1 through 85 above.

87. Plaintiff is the owner of notable goodwill associated with its karaoke products identified by specific insignia and marks.

88. Defendants' use and display karaoke products that include the insignia and marks specifically identifying them as sourced from plaintiff when they are not in fact legitimately sourced from plaintiff.

89. Defendants economically profited from the illegitimate and illegal use and display of karaoke products and services which include the insignia and marks specifically identifying them as sourced from plaintiff.

90. Plaintiff and plaintiff's goodwill suffered damage due to defendants' illegitimate and illegal use and display of karaoke products which include the insignia and marks specifically identifying them as sourced from plaintiff.

## FIFTH CLAIM FOR RELIEF

### ORS §§ 20.080 AND 20.082

91. Plaintiff re-alleges paragraphs 1 through 89 above.

92. More than thirty (30) days prior to filing the present complaint, plaintiff made a demand on defendants for monetary damages of $10,000.00.

93. Defendants have failed or refused to pay plaintiff's demand.

94. Pursuant to ORS §§ 20.080 and/or 20.082, plaintiff shall be awarded all costs and fees in this matter.

## NOTICE OF FURTHER CLAIMS

95. While the relief prayed for by plaintiff is specific, plaintiff hereby provides notice of the potential damages available under various State and Federal Laws, such as 15 U.S.C. 1117 and 1118, which include:

    a. Defendants' profits;

    b. Plaintiff's full damages;

c. Trebled damages;

   d. Statutory damages of not less than $1,000.00 per counterfeit mark and damages of up to $2,000,000.00 per counterfeit mark should there be a finding of willful conduct;

   e. Punitive damages;

   f. All costs of this action;

   g. Pre-judgment interest;

   h. Attorney fees; and

   i. Broad equitable relief, including the destruction of all infringing articles;

96. Plaintiff gives notice it may move to elect the full scope of relief available against defendants as discovery proceeds.


## PRAYER FOR RELIEF

Wherefore, plaintiff Slep-Tone prays for a judgment against defendants and that the court:

   A. Find defendants have committed acts of infringement, including, but not limited to counterfeiting or benefiting from the counterfeit use of the federally registered Sound Choice marks;

   B. Find defendants have engaged in unfair competition against plaintiff Slep-Tone in violation of 15 U.S.C. § 1125(a);

   C. Find defendants have violated plaintiff's rights pursuant to ORS §§ 647.005, et seq.

   D. Find defendants have committed the common law tort of passing off;

   E. Find defendants' activities were in all respects conducted willfully and for profit;

   F. Enter a judgment against defendants and in favor of plaintiff Slep-Tone in the amount of $10,000.00;

G. Award plaintiff Slep-Tone its costs of suit and attorney fees pursuant to ORS §§ 20.080 and/or 20.082, and other relevant statutes; and

H. Grant plaintiff Slep-Tone such further relief as justice may require.

DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and LR 38-1, plaintiff Slep-Tone hereby demands a trial by jury.

DATED: May 7, 2014.

Respectfully submitted,

*/s/ Carl D. Crowell*
Carl D. Crowell, OSB No. 982049
email: crowell@kite.com
Crowell Law
P.O. Box 923
Salem, OR 97308
(503) 581-1240
Of attorneys for the plaintiff