# EXHIBIT 1

**Stephen J. Joncus**, OSB #013072
Email:  stephen.joncus@klarquist.com
KLARQUIST SPARKMAN, LLP
121 S.W. Salmon Street, Suite 1600
Portland, Oregon  97204
Telephone:  503-595-5300
Facsimile:  503-595-5301

*Attorneys for Defendant*
*SHEA FAMILY CORP.*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| **SLEP-TONE ENTERTAINMENT CORPORATION,**<br><br>                    Plaintiff,<br><br>    v.<br><br>**SHEA FAMILY CORP., d/b/a HAVANA WEST,**<br><br>                    Defendants. | Civil No. 6:13-cv-00862-TC<br><br>**DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO FILE FIRST AMENDED COMPLAINT** |

Plaintiff's motion to amend is mean spirited and vexatious. The same can be said for this entire lawsuit.

The Shea Family Corp. closed its restaurant and bar (Havana West) one year ago, in January 2013. Havana West was not profitable and was being sold. The initial agreement to sell the business was signed in the summer of 2012. Slep-Tone's original lawsuit was not served until after Havana West had closed, in February 2013. (*Slep-Tone v. Denny's et. al*., 6:13-cv-00051) (Dkt. 34). This action was filed in May 2013 after Havana West was dismissed from *Slep-Tone v. Denny's et. al*.

The sole shareholder in Shea Family Corp. is Mrs. Carrie Shea. Mrs. Shea is 84 years old and in poor health. She lives in Northeast Portland with her husband, Mr. Robert Shea who is 84 and also in poor health. The business was sold for $70,000. At the time of the sale, the Shea Family Corp. had approximately $140,000 in debt. The Shea Family Corp. currently has no assets. Robert and Carrie Shea survive on their small savings and social security.

Kimberly Martin is the daughter of Robert and Carrie Shea. She is 61. Mrs. Martin's husband is 75 and has not worked for more than 10 years. Mrs. Martin was the manager for Havana West. During the last few years of its operation, she took no wages because the business could not afford to pay her. Mrs. Martin does not have a bank account. Mrs. Martin and her husband live with her parents in her parent's house.

The Shea Family Corp. never owned any karaoke equipment. To provide karaoke entertainment two nights a week, it hired Cliff Keller who operated a karaoke business called Killer Karaoke. Mr. Keller was paid $100 a night for his karaoke show on Wednesday and Thursday nights.

Mr. Keller got into the karaoke business through support from the State of Oregon. As

part of the Vocational Rehabilitation program of the Department of Human Services, the State of Oregon purchased a CAVS karaoke machine for Mr. Keller and a collection of karaoke songs.

Prior to hiring counsel, Shea Family Corp. offered Slep-Tone $2,000 to settle the lawsuit—the same amount required to get an attorney to take the case. Slep-Tone rejected that offer.

It is not a surprise that the Court has not seen high quality work from those that Slep-Tone has sued in Oregon. The defendants simply cannot afford a defense against Slep-Tone.[1] Shea Family Corp. has done nothing wrong, but finds itself caught in a legal situation with no good options—it cannot afford to defend itself and it cannot afford to pay Slep-Tone's extortionate demands.

A window into the nature of Slep-Tone's litigation practices can be gained through study of the case *CAVS USA Inc. v. Slep-Tone Entertainment Corp.*, 2:11-cv-05574 (CD. Cal.). CAVS is a manufacturer of karaoke machines.[2] CAVS sued Slep-Tone for trade libel among other things and has the financial resources to battle Slep-Tone on a more level playing field.

Through the record of that lawsuit, we can glimpse the true nature of Slep-Tone's litigation practices:

> On information and belief, [Slep-Tone's] current, primary business is suing karaoke disc jockeys and karaoke restaurants and bars. . . .
>
> Sound Choice formed, controlled and operated a separate enterprise (the "False Copyright Coercion Enterprise"), the common and primary purposes of which were and are to: . . . extorting [sic] payments and anti-competitive "settlement" agreements through threats of baseless litigation and commercial espionage

---

[1] Prior to this case, the Court appointed me as pro bono counsel for Duffy's Irish Pub who had also been sued by Slep-Tone. The work that my firm did for Duffy's Irish Pub would have been billed at more than $120,000 had we been hired on a fee for services basis. That is more than the value of Duffy's Irish Pub or Havana West.

[2] Indeed, the machine used by Killer Karaoke at Havana West was a CAVS karaoke machine.


against those customers and potential customers and their clients....

Under Sound Choice's scheme to defraud, a number of its false representations were made under the false pretense and guise of anti-piracy efforts for the ostensible objective of stopping the copyrighting and downloading of music content files from CD+G discs to MP3+G format on karaoke player hard drives under the color of copyright enforcement. However, Sound Choice knew that this predatory campaign was rooted in fraud, as it did not own, and has not owned, valid copyrights to musical content that it falsely claimed was being infringed through CAVS' media-shifting from CD+G discs to MP3+G.

Indeed, Sound Choice has been repeatedly sued for copyright infringement over its use of musical content for karaoke tracks without property authorization from the lawful copyright holders such as the music publishers. Specifically, beginning on or around 2002, various music labels, including Zomba Enterprises, BMG Music, and Rondor Music, Int'l, filed a series of copyright infringement lawsuits against Sound Choice in the Central District of California, Case No. 2:02-cv-9377 and in the District Court for the Middle District of Tennessee, Case No. 3:03-cv-00037. In 2006, Sound Choice, along with its principals, Derek and Kurt Slep, were sued by another music publisher, Famous Music, LLC in Case No. 3:06-cv-00696. In the same year, publishers Andrew Scott Music and Helena Music sued Sound Choice and Derek and Kurt Slep, for copyright infringement in the Southern District of New York, Case No. 06-cv-3710. Additionally, as recently as February 1, 2013, Sound Choice was again sued by music publishers, including EMI Music, Inc., for copyright infringement in the Southern District of New York, Case No. 1:13-cv-00749-LLS....

The pattern of racketeering activity committed by Sound Choice over the last ten years also included its so-called "media-shifting policy," another scheme to defraud and extort CAV's customers, potential customers and business affiliates. Notwithstanding Sound Choice's recognition that it did not own the copyrights to the musical content, Sound Choice, through the False Copyright Coercion Enterprise, implemented its media-shifting policy under the color of copyright enforcement and carried out a campaign of policing karaoke hard drives sold through online merchant sites, demanding audits on the karaoke music files on the CAVS karaoke players of karaoke jockeys ("KJ") performing at venues across the country, and extorting money in the form of settlement payments in cash or purchases of Sound Choice products. . . .

Another lynchpin of Sound Choice's pattern of fraud and extortion, executed through the False Copyright Coercion Enterprise, was its "Verified Compliance Safe Harbor Program," which targeted users of CAVS karaoke machines. Sound Choice's "Safe Harbor Program" was and is expressly predicated on copyrights that Sound Choice knew it neither owns nor is authorized to enforce. . . .

Under its Verified Compliance Program, Sound Choice asserted, under false


pretenses, unqualified audit rights to examine the musical content contained in CAVS machines owned by KJs performing at various venues across the United States, including California, Arizona, Nevada, Washington, Oregon, and Ohio, on pain of legal action and six-figure statutory damages for copyright infringement should the KJs or venues refuse the audit. Utilizing APS and other private investigators and enforcers, Sound Choice commissioned surveillance investigations at venues across the United States to conduct these demand audits. Sound Choice falsely represented to users of CAVS machines that the machines were "illegal." Such false statements were made by Sound Choice and its agents such as APS in face-to-face communications with users of CAVS products and in mailed and emailed communications. In some cases, Sound Choice would commence suit against the KJs and the karaoke venues prior to any confirmation of the presence of any Sound Choice musical content, let alone any infringing content, on the karaoke machines. . . .

Additionally, Sound Choice sent cease and desist letters to karaoke venues, demanding that these venues refrain from hiring KJs using CAVS machines to perform karaoke hosting services at these establishments. These letters expressly alleged copyright infringement notwithstanding the fact that Sound Choice did not have valid copyrights or other authorization to enforce the copyrights for the karaoke musical content. . . .

As part and parcel of this predatory scheme executed through the False Copyright Coercion Enterprise, Sound Choice, through threats of crippling litigation and other coercion, extorted "settlement payments" from KJs that were using or had used CAVS machines, ranging from $5,000 to $10,000 in cash or in purchases of Sound Choice's Gem Series discs. In the settlement agreements exacted by Sound Choice, it admitted that it does "not control 100% of all the IP rights associated with the music" and "cannot speak for the other rights holders" for the music in the Gem Series discs. Thus, although KJs may have paid Sound Choice "compliance" or "protection" monies, they in fact received virtually no rights or protection other than avoiding continued harassment by Sound Choice.

(Ex. 1 at ¶¶ 8, 14, 26, 27, 29, 31, 32, 35, 37.) [3]

In its motion for summary judgment, CAVS explained how Slep-Tone devised a litigation strategy to extort money from "little guys" such as Shea Family Corp. using its sham

---

[3] Ex. 1 is a copy of CAVS USA, Inc.'s Second Amended Complaint against Slep-Tone filed on April 12, 2013 as Dkt. 90 in *CAVS USA Inc. v. Slep-Tone Entertainment Corp.*, 2:11-cv-05574 (CD. Cal.).

trademark claims as a substitute for its non-existent copyrights.[4]

> Together with Associated Protective Services ("APS"), an Arizona-based investigative services company and other investigators across the country, Sound Choice formed, controlled and operated this purported "enforcement program," the common and primary purposes of which were and are to implement and enforce a policy to prevent media-shifting of recorded music tracks from Sound Choice's obsolete disks onto CAVS' digital hard drives, predicated on alleged copyrights as discussed below. (*See* SUF at ¶ 13.) However, Sound Choice knowingly neither owned nor had authority to enforce those copyrights. *Id.* Put another way, Sound Choice, APS, and other investigators made this all up in an effort to prevent loss of business and replace the loss of revenue streams from Sound Choice's outdated products.
>
> At Sound Choice's direction, investigators physically went to the places of business of CAVS' customers and potential customers to "observe" their karaoke activities preparatory to demands for payments to Sound Choice—whether in the form of "audit fees" or purchases of additional Sound Choice products—for alleged intellectual property infringement. (SUF at ¶ 14.) Notwithstanding Sound Choice's recognition that it did not own the copyrights to the musical content, Sound Choice implemented its media-shifting policy and carried out a campaign of policing karaoke hard drives sold through online merchant sites, demanding audits on the karaoke music files on the CAVS karaoke players of karaoke disc jockeys ("KJs"), who hosted karaoke shows at venues across the country, and demanding money in the form of settlement payments in cash or purchases of Sound Choice products. (*See* SUF at ¶¶ 13-15.)

(Ex. 2 at pp 5-6.)[5]

> Probably because it knew it did not own copyrights even though it threatened copyright infringement, Sound Choice devised a litigation strategy when it did sue, of suing for trademark infringement, on the dubious theory that display of a Sound Choice logo on a karaoke screen from a Sound Choice recorded track somehow became something else when it was on a hard drive and not a disk.

(*Id.* at p. 7, n.2.)

---

[4] Slep-Tone does not appear to own any copyrights. In the CAVS litigation, Slep-Tone never produced evidence of its ownership of any copyrights. Ex. 4 is a copy of CAVS' motion *in limine* filed on Oct. 15, 2013 as Dkt. 132 to exclude any mention that Slep-Tone owned any copyrights because Slep-Tone had not produced any evidence of copyrights in response to discovery requests.

[5] Ex. 2 is CAVS USA, Inc.'s Motion for Partial Summary Judgment against Slep-Tone filed on Sept. 20, 2013 as Dkt. 113 in *CAVS USA Inc. v. Slep-Tone Entertainment Corp.*, 2:11-cv-05574 (CD. Cal.).

> Sound Choice has been engaged in a pattern of fraudulent enforcement and misrepresentation, usually against "little guys" such as karaoke bar owners who are susceptible to quick, extorted settlements to avoid threatened litigation. This is no different than if Sound Choice had robbed these businesses at gunpoint; it is stolen money, and a criminal enterprise.

(*Id.* at p. 2.)

These allegations from the CAVS litigation aptly describe what is happening in Oregon. Slep-Tone's suit against Shea Family Corp. is an example of Slep-Tone's bullying and extortionate litigation practices. The business operated by Shea Family Corp. was not profitable. It closed Havana West before this suit started, and it has no assets. Moreover, Shea Family Corp. did nothing to harm Slep-Tone. It hired someone else to put on karaoke shows. Rather than doing the honorable thing and dismissing this suit, Slep-Tone is casting about for someone that it can try to extort money from. Specifically, Slep-Tone is trying to expand this lawsuit to ensnare Kimberly Martin individually.

Further, Slep-Tone is attempting to add the even more far-fetched claim of contributory trademark infringement. Whereas intent is not a requirement for direct trademark infringement, contributory infringement requires a nefarious *mens rea*. *See Inwood Labs v. Ives Labs., Inc.*, 456 U.S. 844, 854 (1982).

Slep-Tone does not attempt to plead any facts making it contributory infringement claim plausible. Slep-Tone is required to plead facts that the allow the Court to infer nefarious intent rather than the obvious alternative explanation involving innocent intent. *See Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009) ("As between that obvious alternative explanation for the arrests, and the purposeful, invidious discrimination respondent asks us to infer, discrimination is not a plausible conclusion.") (internal quotes and citation omitted).

Not only does Slep-Tone fail to plead any facts that show knowledge and intent, such an

inference makes no sense in view of the circumstances. A struggling bar manager, trying to keep the business going, decides that she needs to infringe Slep-Tone's trademark in order to bring in customers. Really? So it conspires with Killer Karaoke with the knowledge that Killer Karaoke illegally uses the Sound Choice trademark, so that more people will come to Havana West. Come on—this makes no sense.

What Slep-Tone's motion demonstrates is the extent that Slep-Tone will stretch the matter to try to scoop up some money. Slep-Tone's motion is mean spirited. It is vexatious. It should not be tolerated.

In another Slep-Tone case against a karaoke bar in California, Judge Otis Wright aptly described the Slep-Tone lawsuit as "nothing more than a shakedown suit." (Ex. 3)[6] Judge Wright went on to say that "Slep-Tone takes trolling to the next level and essentially ignored all requests for discovery, explanations of exculpability, and requirements to act in good faith." (*Id.*) "Therefore the Court finds that Slep-Tone's conduct was both vexatious and in bad faith, and awards Defendants reasonable attorney's fees in the sum of $18,105." (*Id.*)

Slep-Tone asserts that amendments should be liberally applied, citing *United States v. Webb*, 655 F.2d 977 (9th Cir. 1981). But Courts do not allow amendment when they are in bad faith or futile. *Id.* at 980. Nor are amendments adding parties granted as freely as amendments adding claims. *Union Pacific R. Co. v. Nevada Power Co.*, 950 F.2d 1429, 1432 (9th Cir. 1991); *Clausen v. M/V New Carissa*, 171 F. Supp. 2d 1127, 1130 (D. Ore. 2001) (citing *Union Pacific*).

Slep-Tone asks to add Mrs. Kimberly Martin as an individual defendant. This is in apparent response to the fact that Shea Family Corp. has no assets. Slep-Tone states no facts

---

[6] Ex. 3 is the Order granting sanctions against Slep-Tone filed as Dkt. 104 on January 15, 2013 in *Slep-Tone Entertainment Corp. v. Backstage Bar and Grill, et al.*, 2:11-cv-8305 (C.D. Cal.).

showing how Kimberly Martin could be individually liable. She was the manager of her mother's business. That does not make her responsible for the liabilities of the business.

The very act of attempting to add Mrs. Kimberly Martin to this suit speaks volumes about Slep-Tone. Mrs. Martin does not even have a bank account, yet Slep-Tone tenaciously pursues every possible avenue to get money. It does not care who it sues. It does not care what the merits are. It will use its superior resources to chase whomever it targets in its extortionate zeal. This amendment is both in bad faith and futile.

Slep-Tone's request to add a claim for contributory trademark infringement is in apparent acknowledgement of the fact that Havana West never owned or operated any karaoke machine. Slep-Tone relies heavily on *Fonovisa Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996). However that case involved a raid by the Sheriff that seized 38,000 counterfeit recordings in 1991, a subsequent letter from the Sheriff in 1992, and an investigation by Fonovisa in 1993. *Id.* at 261. Those facts bear no relationship to this case.

Again, Slep-Tone's pursuit of this amendment speaks volumes about Slep-Tone. This amendment is both in bad faith and futile.

The Court should deny Slep-Tone's motion.

Respectfully submitted,

Dated: January 21, 2014     By:     s/Stephen J. Joncus
**Stephen J. Joncus**, OSB #013072
Email: stephen.joncus@klarquist.com
KLARQUIST SPARKMAN, LLP
121 S.W. Salmon Street, Suite 1600
Portland, Oregon 97204
Telephone: 503-595-5300
Facsimile: 503-595-5301

*Attorneys for Defendants*

DEFENDANT'S RESPONSE TO PLAINTIFF'S
MOTION TO FILE FIRST AMENDED COMPLAINT
Page 8

Exhibit 1
Page 9

*SHEA FAMILY CORP., d/b/a HAVANA WEST*