IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SLEP-TONE ENTERTAINMENT
CORP.,

       Plaintiff,

                                3:14-CV-764-PK

v.                                  FINDINGS AND
                                  RECOMMENDATION

CANTON PHOENIX INC., and BING
PAN ZHU,

       Defendants.

PAPAK, Magistrate Judge:

      Plaintiff Slep-Tone Entertainment Corporation ("Slep-Tone") filed this trademark action

against defendants Canton Phoenix Incorporated ("Canton Phoenix") and Bing Pan Zhu ("Bing")

on May 7, 2014. By and through its complaint, Slep-Tone alleges that it is the owner of

trademarks and protectable trade dress in connection with karaoke CDs it is in the business of

producing, marketing and selling. Slep-Tone further alleges that defendants Canton Phoenix, a

Tigard-area restaurant and bar, and Bing, the owner/manager of Canton Phoenix, possess a

computer hard drive upon which are stored over 24,000 unauthorized and unlicensed copies of

Page 1 - FINDINGS AND RECOMMENDATION

karaoke tracks (audiovisual recordings) bearing Slep-Tone's trademarks and distinctive trade dress, and have used those tracks for the purpose of providing karaoke entertainment services to Canton Phoenix's customers without any license or other authority to do so. Slep-Tone alleges defendants' liability arising out of that complained-of conduct for (i) trademark infringement in violation of the Lanham Act (the federal trademark statute), (ii) unfair competition in violation of the Lanham Act, (iii) trademark infringement in violation of Oregon statutory trademark law, (iv) passing off in violation of Oregon common law, and (v) Slep-Tone's attorney fees incurred in this action pursuant to Or. Rev. Stat. 20.080 and/or 20.082. Slep-Tone alleges that it has been damaged by defendants' complained-of conduct in the amount of $10,000.[1] This court has jurisdiction over Slep-Tone's Lanham Act claims pursuant to 28 U.S.C. §§ 1331 and 1338, and may properly exercise supplemental jurisdiction over Slep-Tone's state-law claims pursuant to 28 U.S.C. § 1367.

Now before the court is defendants' motion (#13) to dismiss Slep-Tone's claims for failure to state a claim upon which relief can be granted. I have considered the motion, oral argument on behalf of the parties, and all of the pleadings and papers on file. For the reasons set forth below, defendants' motion should be granted.

## LEGAL STANDARD

To survive dismissal for failure to state a claim pursuant to Rule 12(b)(6), a complaint

---

[1] Although Slep-Tone specifically alleges $10,000 in monetary damages, by and through its complaint it additionally "provides notice of" additional damages purportedly potentially available to it, including defendants' profits, its own "full" damages, trebled damages, statutory damages of not less than $1,000 per counterfeit mark and up to $2,000,000 per counterfeit mark should defendants' alleged infringement be deemed to have been willful, punitive damages, and injunctive relief to destroy the infringing materials.

must contain more than a "formulaic recitation of the elements of a cause of action;" specifically, it must contain factual allegations sufficient to "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To raise a right to relief above the speculative level, "[t]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Id.*, *quoting* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004); *see also* Fed. R. Civ. P. 8(a). Instead, the plaintiff must plead affirmative factual content, as opposed to any merely conclusory recitation that the elements of a claim have been satisfied, that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), *citing Twombly*, 550 U.S. at 556. "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. United States Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009), *citing Iqbal*, 556 U.S. at 678.

"In ruling on a 12(b)(6) motion, a court may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007). In considering a motion to dismiss, this court accepts all of the allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *See Kahle v. Gonzales*, 474 F.3d 665, 667 (9th Cir. 2007). Moreover, the court "presume[s] that general allegations embrace those specific facts that are necessary to support the claim." *Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 256 (1994), *quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The court need not, however,

Page 3 - FINDINGS AND RECOMMENDATION

accept legal conclusions "cast in the form of factual allegations." *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981).

## FACTUAL BACKGROUND

### I.    The Parties

Plaintiff Slep-Tone is a North Carolina corporation with its principal place of business in Pineville, North Carolina. Slep-Tone is engaged in the business of producing, marketing, and selling karaoke CDs and related products.

Defendant Canton Phoenix is an Oregon corporation with its principal place of business in Tigard, Oregon, doing business at that location as the Canton Phoenix restaurant and bar. Defendant Bing is the owner and manager of Canton Phoenix. Canton Phoenix and Bing offer karaoke entertainment services to Canton Phoenix's customers.

### II.    The Parties' Dispute[2]

Slep-Tone is the owner of U.S. Trademark Reg. Nos. 1,923,448 and 4,099,045 for the trademark "SOUND CHOICE" and of U.S. Trademark Reg. No. 2,000,725 for a display trademark containing a visual representation of the phrase "Sound Choice," each of which it has at all material times consistently displayed with the symbol "®" in order to provide the public with notice that its marks are federally registered. In addition, Slep-Tone is the owner of distinctive and protectable trade dress in the graphical displays of its karaoke products, including the typeface, style, and visual arrangement of lyrics, the use of particular color-coding to display lyrics and other information, and the use of particular graphics to display cues for the

_____

[2] Except where otherwise indicated, the following recitation constitutes my construal of the allegations of plaintiff Slep-Tone's complaint and of any matters properly subject to judicial notice in the light most favorable to Slep-Tone.

convenience of users of Slep-Tone's karaoke products.

Defendants have in their possession and control a hard drive upon which are stored over 24,000 karaoke tracks utilizing Slep-Tone's trade dress and displaying Slep-Tone's trademarks (the "tracks") that defendants regularly make available to Canton Phoenix's customers for the purpose of karaoke entertainment. Defendants lack any license or other authority from Slep-Tone for using the tracks, and the tracks were stored on the hard drive in violation of Slep-Tone's "media-shifting tolerance" policy (pursuant to which Slep-Tone may under specified circumstances authorize licensed users of Slep-Tone karaoke products to store karaoke tracks on a hard drive so long as such users at all times retain local possession of the original Slep-Tone CDs from which such tracks were shifted to the hard drive). At all material times, defendants were aware that they lacked any license or other authorization from Slep-Tone to make the tracks available to their customers. Defendants have derived commercial benefit from the foredescribed use of the tracks. Moreover, it is Slep-Tone's position that when the tracks are performed or presented at Canton Phoenix, defendants' customers have been (or are likely to have been) deceived by the graphical display of Slep-Tone's trademarks and trade dress into believing that defendants have properly licensed and/or legally purchased the tracks.

More than thirty days prior to bringing this action, Slep-Tone made written demand on defendants for monetary damages caused by defendants' complained-of conduct in the amount of $10,000, and defendants either failed or refused to tender the demanded payment. This action followed.

# ANALYSIS

Slep-Tone alleges defendants' liability for trademark infringement under the Lanham Act (specifically, 15 U.S.C. § 1114(1)), for unfair competition under the Lanham Act (specifically, 15 U.S.C. § 1125(a)(1)), for trademark infringement under Oregon's statutory Trademarks and Service Marks scheme (specifically, Or. Rev. Stat. 647.095), for passing off under the common law of Oregon (*see, e.g.*, *Classic Instruments v. Vdo-Argo Instruments*, 73 Or. App. 732, 745 (1985)), and for Slep-Tone's reasonably incurred attorney fees under Oregon's statutory provision governing small tort claims in which a written demand for damages is made not less than thirty days before the tort claim is filed (specifically, Or. Rev. Stat. 20.080 and/or 20.082).  The chief gravamen of defendants' motion to dismiss Slep-Tone's claims is that the rights Slep-Tone is seeking to enforce sound exclusively in copyright, such that none of its trademark claims can lie on the facts alleged in Slep-Tone's complaint.  I address the parties' arguments in connection with each of Slep-Tone's claims in turn, below.

## I.    Slep-Tone's Lanham Act Claims

Regarding trademark infringement, the Lanham Act provides, in relevant part, that:

Any person who shall, without the consent of the registrant—

(a)    use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b)    reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or

> advertising of goods or services on or in connection with which
> such use is likely to cause confusion, or to cause mistake, or to
> deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter
provided.  Under subsection (b) hereof, the registrant shall not be entitled to
recover profits or damages unless the acts have been committed with knowledge
that such imitation is intended to be used to cause confusion, or to cause mistake,
or to deceive.

15 U.S.C. § 1114(1) (formerly and still occasionally referred to as "Section 32(a)" of the Lanham

Act).  Regarding unfair competition, the Lanham Act provides, in relevant part, that:

> Any person who, on or in connection with any goods or services, or any container
> for goods, uses in commerce any word, term, name, symbol, or device, or any
> combination thereof, or any false designation of origin, false or misleading
> description of fact, or false or misleading representation of fact, which—
>
> (A)    is likely to cause confusion, or to cause mistake, or to deceive as to
>        the affiliation, connection, or association of such person with
>        another person, or as to the origin, sponsorship, or approval of his
>        or her goods, services, or commercial activities by another person,
>        or
>
> (B)    in commercial advertising or promotion, misrepresents the nature,
>        characteristics, qualities, or geographic origin of his or her or
>        another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is
> likely to be damaged by such act.

15 U.S.C. § 1125(a)(1) (formerly and still occasionally referred to as "Section 43(a)" of the

Lanham Act).

In connection with either a trademark infringement or an unfair competition claim under

the Lanham Act, a plaintiff "must establish both (1) that it has a protected interest (or trademark

right) in the [mark at issue] and (2) that [the defendant's] usages are likely to cause consumer

confusion and thus infringe upon that interest." *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d

1352, 1354 (9th Cir. 1985).  In considering whether a plaintiff has met its burden under the second prong of the *Levi Strauss* test, the courts of the Ninth Circuit generally consider "eight factors that are relevant to the likelihood of confusion," namely:

1. strength of the plaintiff's mark;
2. relatedness of the goods;
3. similarity of the marks;
4. evidence of actual confusion;
5. marketing channels used;
6. likely degree of purchaser care;
7. defendant's intent in selecting the mark;
8. likelihood of expansion of the product lines.

*Toho Co. v. Sears, Roebuck & Co.*, 645 F.2d 788, 790 (9th Cir. 1981), *citing AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979); *see also Levi Strauss*, 778 F.2d at 1360 (same), 1359 ("In order to establish customer confusion [a Lanham Act plaintiff] must establish that use of [its protectable] mark on [a defendant competitor's product] is likely to cause a reasonably knowledgeable and prudent purchaser to believe that [the plaintiff] was the manufacturer of [the competitor's product]").

Notwithstanding the foregoing, it is clear from both United States Supreme Court and Ninth Circuit jurisprudence that not all potential consumer confusion involving commercial use of a product bearing an enforceable trademark (or bearing protectable trade dress) can give rise to a Lanham Act claim.  Of particular relevance here, it is well established that the protections of the Lanham Act do not extend to the rights governed and circumscribed by federal copyright law. Because there is no clear consensus among the district courts of this circuit as to the application of the Lanham Act jurisprudence to facts like those alleged in Slep-Tone's complaint, it is worthwhile to consider the governing jurisprudence in some detail.

In *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), the United

States Supreme Court was presented with facts as follows:

> In 1948, three and a half years after the German surrender at Reims, General
> Dwight D. Eisenhower completed Crusade in Europe, his written account of the
> allied campaign in Europe during World War II. Doubleday published the book,
> registered it with the Copyright Office in 1948, and granted exclusive television
> rights to an affiliate of respondent Twentieth Century Fox Film Corporation
> (Fox). Fox, in turn, arranged for Time, Inc., to produce a television series, also
> called Crusade in Europe, based on the book, and Time assigned its copyright in
> the series to Fox. The television series, consisting of 26 episodes, was first
> broadcast in 1949. It combined a soundtrack based on a narration of the book
> with film footage from the United States Army, Navy, and Coast Guard, the
> British Ministry of Information and War Office, the National Film Board of
> Canada, and unidentified "Newsreel Pool Cameramen." In 1975, Doubleday
> renewed the copyright on the book as the "'proprietor of copyright in a work made
> for hire.'" . . . Fox, however, did not renew the copyright on the Crusade
> television series, which expired in 1977, leaving the television series in the public
> domain.
>
> In 1988, Fox reacquired the television rights in General Eisenhower's book,
> including the exclusive right to distribute the Crusade television series on video
> and to sub-license others to do so. Respondents SFM Entertainment and New
> Line Home Video, Inc., in turn, acquired from Fox the exclusive rights to
> distribute Crusade on video. SFM obtained the negatives of the original television
> series, restored them, and repackaged the series on videotape; New Line
> distributed the videotapes.
>
> Enter petitioner Dastar. In 1995, Dastar decided to expand its product line from
> music compact discs to videos. Anticipating renewed interest in World War II on
> the 50th anniversary of the war's end, Dastar released a video set entitled World
> War II Campaigns in Europe. To make Campaigns, Dastar purchased eight beta
> cam tapes of the *original* version of the Crusade television series, which is in the
> public domain, copied them, and then edited the series. Dastar's Campaigns series
> is slightly more than half as long as the original Crusade television series. Dastar
> substituted a new opening sequence, credit page, and final closing for those of the
> Crusade television series; inserted new chapter-title sequences and narrated
> chapter introductions; moved the "recap" in the Crusade television series to the
> beginning and retitled it as a "preview"; and removed references to and images of
> the book. Dastar created new packaging for its Campaigns series and (as already
> noted) a new title.

> Dastar manufactured and sold the Campaigns video set as its own product. The
> advertising states: "Produced and Distributed by: *Entertainment Distributing*"
> (which is owned by Dastar), and makes no reference to the Crusade television
> series. Similarly, the screen credits state "DASTAR CORP presents" and "an
> ENTERTAINMENT DISTRIBUTING Production," and list as executive
> producer, producer, and associate producer, employees of Dastar. . . . The
> Campaigns videos themselves also make no reference to the Crusade television
> series, New Line's Crusade videotapes, or the book. Dastar sells its Campaigns
> videos to Sam's Club, Costco, Best Buy, and other retailers and mail-order
> companies for $25 per set, substantially less than New Line's video set.

*Dastar*, 539 U.S. at 25-27 (emphasis original; citations to the record omitted). *Dastar*

respondents Fox, SFM, and New Line brought copyright and Lanham Act claims against Dastar,

their Lanham Act claims being premised on the theory that the failure to attribute the origin of

Dastar's Campaigns video in the Time Crusade in Europe television series was a form of "reverse

passing off" in violation of Section 43(a) of the Lanham Act. *See id.* at 27. The *Dastar* court

roundly rejected the respondents' theory that the Lanham Act's prohibition of any "false

designation of origin" requires attribution to the holder of rights in a work of intellectual

property; while Slep-Tone's claims do not depend in any respect on the validity of the *Dastar*

respondents' rejected theory, the court's reasoning nevertheless provides guidance material to the

issues now before this court.

The *Dastar* court began its analysis by re-affirming the longstanding proposition that the

Lanham Act cannot properly be construed as providing protections of the same nature as those

provided by copyright or patent law:

> The problem with [interpreting Section 43(a) to require attribution to the author of
> a trademarked work of intellectual property] is that it causes the Lanham Act to
> conflict with the law of copyright, which addresses that subject specifically. **The
> right to copy, and to copy without attribution, once a copyright has expired,
> like "the right to make an article whose patent has expired--including the
> right to make it in precisely the shape it carried when patented--passes to the**

public." *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 230, 11 L. Ed. 2d
661, 84 S. Ct. 784, 1964 Dec. Comm'r Pat. 425 (1964); *see also Kellogg Co. v.
National Biscuit Co.*, 305 U.S. 111, 121-122, 83 L. Ed. 73, 59 S. Ct. 109, 1939
Dec. Comm'r Pat. 850 (1938). **"In general, unless an intellectual property
right such as a patent or copyright protects an item, it will be subject to
copying."** *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29,
149 L. Ed. 2d 164, 121 S. Ct. 1255 (2001). The rights of a patentee or copyright
holder are part of a "carefully crafted bargain," *Bonito Boats, Inc. v. Thunder
Craft Boats, Inc.*, 489 U.S. 141, 150-151, 103 L. Ed. 2d 118, 109 S. Ct. 971
(1989), under which, once the patent or copyright monopoly has expired, the
public may use the invention or work at will and without attribution. **Thus, in
construing the Lanham Act, we have been "careful to caution against misuse
or over-extension" of trademark and related protections into areas
traditionally occupied by patent or copyright.** *TrafFix*, 532 U.S., at 29, 149 L
Ed 2d 164, 121 S Ct 1255.

*Id.* at 33-34 (emphasis supplied; internal modifications omitted). The court specifically noted

that:

"The Lanham Act. . . does not exist to reward manufacturers for their innovation
in creating a particular device; that is the purpose of the patent law and its period
of exclusivity." [*TrafFix*, 532 U.S.] at 34. . . . **Federal trademark law "has no
necessary relation to invention or discovery,"** *Trade-Mark Cases*, 100 U.S. 82,
94, 25 L. Ed. 550, 1879 Dec. Comm'r Pat. 619 (1879), **but rather, by preventing
competitors from copying "a source-identifying mark," "reduces the
customer's costs of shopping and making purchasing decisions," and "helps
assure a producer that it (and not an imitating competitor) will reap the
financial, reputation-related rewards associated with a desirable product,"**
*Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 163-164, 131 L. Ed. 2d
248, 115 S. Ct. 1300 (1995) (internal quotation marks and citation omitted).
Assuming for the sake of argument that Dastar's representation of itself as the
"Producer" of its videos amounted to a representation that it originated the
creative work conveyed by the videos, **allowing a cause of action under § 43(a)
for that representation would create a species of mutant copyright law that
limits the public's "federal right to 'copy and to use,'"** expired copyrights,
*Bonito Boats, supra*, at 165, 103 L Ed 2d 118, 109 S Ct 971.

*Id.* at 34 (emphasis supplied). The *Dastar* court expressly cautioned against "reading § 43(a) of

the Lanham Act as creating a cause of action for, in effect, plagiarism--the use of otherwise

unprotected works and inventions without attribution," *id.* at 36, and, "reading the phrase 'origin

Page 11 - FINDINGS AND RECOMMENDATION

of goods' in the Lanham Act in accordance with the Act's common-law foundations (which were *not* designed to protect originality or creativity), and in light of the copyright and patent laws (which *were*)," *id.* at 37 (emphasis original), ultimately concluded that the respondents' claims would not lie under the Lanham Act.  The *Dastar* court thus found the respondents' theory incorrect as a matter of law chiefly and specifically (albeit among other reasons not discussed in detail herein) because their interpretation would permit trademark rights to be enforced to prohibit the public from copying and using intellectual property, which is beyond the scope of trademark law.  Although the *Dastar* court addressed the scenario in which respondents sought to use their extant trademark rights to substitute for their *expired* copyright interests, the court's reasoning naturally applies with equal force where the claimant possesses both valid trademark rights *and* valid copyright interests, but for reasons of its own elects not to enforce its copyright: either in the absence of an enforceable copyright or where a copyright-holder elects not to invoke its copyright, under *Dastar* the protections of the Lanham Act cannot be construed as "dropping down" to provide protection exclusively available under copyright law.

Ninth Circuit jurisprudence similarly draws a bright line between rights that may properly be enforced under copyright law and the protections available under the Lanham Act.  In *Smith v. Chanel, Inc.*, 402 F.2d 562 (9th Cir. 1968), the court considered the question "whether one who has copied an unpatented product sold under a trademark may use the trademark in his advertising to identify the product he has copied."  *Smith*, 402 F.2d at 563.  In concluding "that he may, and that such advertising may not be enjoined under either the Lanham Act, 15 U.S.C. § 1125(a) (1964), or the common law of unfair competition, so long as it does not contain misrepresentations or create a reasonable likelihood that purchasers will be confused as to the

source, identity, or sponsorship of the advertiser's product," *id.*, the court considered precedent

from outside the Ninth Circuit, including *Societe Comptoir de L'Industrie Cotonniere*

*Etablissements Boussac v. Alexander's Dept. Stores, Inc.*, 299 F.2d 33 (2nd Cir. 1962), a case in

which a defendant truthfully advertised its own clothing products as copies of public-domain

Christian Dior designs, using Dior's trademarked name in its advertising.  The *Smith* court quoted

the *Boussac* court's analysis of the claimant's trademark claims with approval as follows:

> **In any proceeding under the Lanham Act the gist of the proceeding is a**
> **"false description or representation," 15 U.S.C.A. § 1125(a), or a use of the**
> **mark which "is likely to cause confusion or mistake or to deceive purchasers**
> **as to the source of origin of such goods or services," 15 U.S.C.A. § 1114(1).**
> Registration bestows upon the owner of the mark the limited right to protect his
> good will from possible harm by those uses of another as may engender a belief in
> the mind of the public that the product identified by the infringing mark is made
> or sponsored by the owner of the mark. *The Lanham Act does not prohibit a*
> *commercial rival's truthfully denominating his goods a copy of a design in the*
> *public domain, though he uses the name of the designer to do so. Indeed it is*
> *difficult to see any other means that might be employed to inform the consuming*
> *public of the true origin of the design.*

*Smith*, 402 F.2d at 565 (italicized emphasis original; bolded emphasis supplied; internal

modifications omitted), *quoting Boussac*, 299 F.2d at 36.  From *Boussac* and other cases, the

*Smith* court derived the rule that "use of another's trademark to identify the trademark owner's

product in comparative advertising is not prohibited by either statutory or common law, absent

misrepresentation regarding the products or confusion as to their source or sponsorship," *id.* at

565-566, opining that "[t]h[is] rule rests upon the traditionally accepted premise that *the only*

*legally relevant function of a trademark is to impart information as to the source or sponsorship*

*of the product*," *id.* at 566 (emphasis supplied; footnote omitted).  The court likewise approved

the corollary proposition that "protection of trademark values other than source identification

would create serious anti-competitive consequences with little compensating public benefit." *Id.* Indeed, the court reasoned, "the practical effect of such a[lternative] rule would be to extend the monopoly of the trademark to a monopoly of the product," where such monopoly would be subject neither to scrutiny or approval by any government body nor to any term of years, as is the case for both copyright and patent protection. *Id.* at 568.[3]

In *Nintendo of Am. v. Dragon Pac. Int'l*, 40 F.3d 1007 (9th Cir. 1994), the Ninth Circuit was confronted with the question "whether an award of both statutory copyright infringement damages and trademark infringement damages for the [same] sale of video game cartridges constitutes an inappropriate 'double recovery.'" *Nintendo*, 40 F.3d at 1009. In analyzing that question, the *Nintendo* court finely parsed the defendant's complained-of conduct to determine which elements of the conduct specifically infringed the Lanham Act, and which the Copyright Act. *See id.* at 1010-1011.

The *Nintendo* defendant was in the business of importing and selling video game cartridges, including cartridges compatible with the video game systems produced and marketed by the plaintiff. *See id.* at 1009. Among the defendant's products were cartridges containing

---

[3] The *Smith* court acknowledged and addressed the incongruity, apparent at a first-pass analysis, in finding a defendant not liable for trademark infringement where the defendant has openly and notoriously copied the plaintiff's product, deriving benefit from having done so without providing recompense to the plaintiff. However, the *Smith* court observed, that incongruity is a direct result of Congress' decision to afford intellectual property the monopolistic protections of copyright and/or patent law for only a limited term, while affording trademark and trade dress only narrowly circumscribed protections but for an unlimited duration: "[d]isapproval of the copyist's opportunism may be an understandable first reaction, 'but this initial response to the problem has been curbed in deference to the greater public good.'" *Smith*, 402 F.2d at 568, *quoting American Safety Table Co. v. Schreiber*, 269 F.2d 255, 272 (2nd Cir. 1959). Viewed from the narrow perspective of trademark law, copying the intellectual property of another, even if for the purpose of commercial gain, is not wrongful (notwithstanding its potential wrongfulness relative to the metric of copyright or patent law).

Page 14 - FINDINGS AND RECOMMENDATION

multiple games, each including between ten and twelve exact copies of games protected by the

plaintiff's registered copyrights. *See id.* These cartridges bore the plaintiff's trademarks, and

indeed were represented as the plaintiff's products. *See id.* The district court below awarded the

plaintiff both statutory damages under the Copyright Act and actual damages under the Lanham

Act. *See id.* The Ninth Circuit rejected the defendant's theory that award of damages under both

statutory schemes constituted, under the circumstances, an impermissible double recovery for the

same violation:

> [The plaintiff]'s claims were not, as [the defendant] suggests, based on the same
> wrongful act. **If [the defendant] had sold the cartridges without representing
> that they were [the plaintiff's] products, he would have committed the wrong
> of copyright infringement. Or, if [the defendant] had represented that the
> cartridges were [the plaintiff's] products, even though they contained no . . .
> games [in which the plaintiff owned the copyright], he would have committed
> the wrong of trademark infringement.** Put together, selling the cartridges may
> have been one act, but it was two wrongs. . . . Congress created two separate
> statutory schemes to govern copyrights and trademarks; in order to effectuate the
> purposes of both statutes, damages may be awarded under both.

*Id.* at 1010-1011 (emphasis supplied).  Thus, under the reasoning of the *Nintendo* court, it is clear

that the open and notorious copying, marketing, and sale of a product subject to the protections

of the Copyright Act is not actionable under the Lanham Act where the copyright-violator claims

the product as its own, without attribution to the original, copyright-holding producer.  It is only

the *attribution* of the copied product to the producer of the original product that constitutes a

violation of the Lanham Act. *See id.*

In similar vein is *Comedy III Prods., Inc. v. New Line Cinema*, 200 F.3d 593, 595 (9th

Cir. 2000), in which the plaintiff owner of trademark rights in the likenesses of the members of

the comedy act The Three Stooges – but not of copyright in The Three Stooges' films, which are

Page 15 - FINDINGS AND RECOMMENDATION

and were in the public domain – sought damages under the Lanham Act based on the defendant's inclusion of a clip from a Three Stooges film in the background of a scene in one of defendant's own films. *See Comedy III*, 200 F.3d at 594-595. The Ninth Circuit characterized the plaintiff's argument as "fanciful," *id.* at 595, and rejected it in summary fashion:

> [T]he footage at issue here was clearly covered by the Copyright Act, 17 U.S.C. § 106, and the Lanham Act cannot be used to circumvent copyright law. If material covered by copyright law has passed into the public domain, it cannot then be protected by the Lanham Act without rendering the Copyright Act a nullity.

*Id.* (citations omitted). The *Comedy III* court further opined that:

> Essentially, [plaintiff] is arguing that the clip at issue falls under the protection of the Lanham Act because it contains elements that in other contexts might serve as trademarks. **Had [defendant] used the likeness of The Three Stooges on t-shirts which it was selling, [plaintiff] might have an arguable claim for trademark violation. But we will not entertain this expedition of trademark protection squarely into the dominion of copyright law,** to allow for Lanham Act coverage of a piece of footage taken directly from a film by The Three Stooges. [Plaintiff]'s assertion that this clip is itself a collection of trademarks of The Three Stooges is unconvincing.

*Id.* at 596 (emphasis supplied). As noted above in connection with the reasoning of the *Dastar* court, the *Comedy III* court's reasoning applies with equal logical force even where the material at issue has not yet passed into the public domain. Federal trademark law can no more be used to afford a trademark-holder copyright-like protection in copyrighted material than it can in public-domain intellectual property, whether or not the trademark-holder is also the holder of the copyright in question.

Although none of the foredescribed cases is precisely on point with the facts as Slep-Tone alleges them, each provides significant guidance as to the scope of the protections available under the Lanham Act. With that guidance in mind, I take preliminary note of the operative

alleged facts at issue and then turn to analysis of Slep-Tone's Lanham Act claims.

As noted above, Slep-Tone has more than adequately alleged that it is the holder of registered trademarks and protectable trade dress in more than 24,000 karaoke tracks stored on defendants' hard drive. Moreover, Slep-Tone has (additionally) alleged facts tending to establish that each of its tracks is a derivative work that Slep-Tone created based on existing underlying works – audio recordings of songs – some of which may have been subject to the protections of the Copyright Act and some of which may have been in the public domain at the time the derivative audiovisual karaoke tracks were created. As such, each of the tracks is automatically subject to copyright protection as a derivative work as of the moment it was first fixed in a tangible medium of expression (as, for example, the karaoke CDs that Slep-Tone is in the business of producing, marketing, and selling), *see* 17 U.S.C. §§ 102(a), 103(a), although the tracks are not subject to copyright protection to the extent, if any, that the underlying audio recordings were used unlawfully in the creation of the derivative works, *see* 17 U.S.C. § 103(a). As works subject to copyright protection, the holder of the copyright in the tracks has, as a matter of law, the exclusive right to reproduce the tracks, prepare further derivative works based on the tracks, to distribute copies of the tracks, and to perform the tracks publicly (or to license others to do so). *See* 17 U.S.C. § 106. Finally, Slep-Tone has alleged facts tending to establish that the tracks on defendants' hard drive are unlicensed, unauthorized copies of Slep-Tone's derivative works. As such (assuming the truth of Slep-Tone's allegations), it is clear that under the Copyright Act defendants would be without authority to reproduce the tracks (as either they or one or more unspecified predecessors in interest are alleged to have done) or to perform the tracks publicly (as they are alleged to do on a regular and continuing basis), and would be in

Page 17 - FINDINGS AND RECOMMENDATION

violation of copyright law each time they do or have done so.[4] *See id.*

The question squarely raised by Slep-Tone's Lanham Act claims is whether defendants' conduct infringes Slep-Tone's trademark rights in a manner likely to cause "consumer confusion" the enjoinment of which would not impermissibly intrude on the exclusive bailiwick of copyright law. Under the principles of the cases discussed above, it does not. First, the presence of Slep-Tone's trademarks at the beginning of each track and the display of Slep-Tone's trade dress throughout each track, under the reasoning of the *Smith* and *Nintendo* courts, *supra*, is not calculated to cause consumer confusion but rather performs the entirely appropriate function of correctly identifying the provenance of the tracks. Second, defendants' conduct is not of the kind that has been held to contravene the Lanham Act; under the reasoning of the *Dastar* and *Comedy III* courts, *supra*, defendants would infringe upon Slep-Tone's trademark rights if they sold karaoke CDs labeled with Slep-Tone's trademarks or advertised Canton Phoenix as offering "Sound Choice" karaoke services, but they do not infringe Slep-Tone's interest in its marks by copying the tracks or by performing them publicly.[5] Effectively, the Lanham Act jurisprudence

---

[4] It is outside the scope of the matters properly before this court to speculate as to Slep-Tone's reasons for electing not to pursue any remedy for defendants' apparent violation of the copyright inhering in the karaoke tracks.

[5] *But cf., e.g., Slep-Tone Entm't Corp. v. Duffy's Irish Pub*, Case No. 6:13-CV-560-TC, 2013 U.S. Dist. LEXIS 152946, *4-7 (D. Or. September 18, 2013) (finding *Dastar* inapplicable to facts closely analogous to those now before the court because the plaintiff karaoke CD producer and trademark claimant did not seek to protect the "intellectual content" of its karaoke tracks through its trademark claims but rather to prevent a third party lacking a license to use the tracks from relying on the claimant's trademarks and trade dress to create the impression that it was the claimant's licensee), *adopted by* 2013 U.S. Dist. LEXIS 152698 (D. Or., Oct. 23, 2013); *Slep-Tone Entm't Corp. v. Shenanigans Lounge*, Case No. 6:12-CV-1236-TC, 2013 U.S. Dist. LEXIS 60432 (D. Or., Feb. 22, 2013) (to same effect), *adopted by* 2013 U.S. Dist. LEXIS 60198 (D. Or. April 20, 2013).

Page 18 - FINDINGS AND RECOMMENDATION

discussed above establishes that federal trademark and copyright law provide non-overlapping rights and protections, and that a trademark holder may not rely upon trademark law to safeguard rights available only under the Copyright Act.

By way of illustration, because the 1925 silent film The Phantom of the Opera is in the public domain, it is uncontroversial that it may be performed publicly, including for the purpose of commercial gain, and that copies of the 1925 public-domain version of the film (as opposed to more recent re-edits which may be subject to copyright as derivative works) may be (and routinely are) packaged under a new label and sold to the public for commercial benefit. The fact that the public-domain film opens and closes with Universal Studios' registered and still-enforceable trademarks is no obstacle to either public performance or sale of the public-domain film, so long as the packaging or labeling of the medium in which the copy is fixed does not bear the Universal Studios trademark or any information likely to confuse consumers as to whether the repackaged copy is a Universal Studios product. Similarly, here, Slep-Tone's registered and enforceable trademarks do not prevent any party from either copying or performing Slep-Tone's karaoke tracks; the rights to copy and to perform are governed by the Copyright Act and not by the Lanham Act.

Although on the facts alleged by Slep-Tone it appears possible that defendants' complained-of conduct may have violated applicable law, for all of the reasons discussed above defendants' violations of Slep-Tone's rights, if any such have occurred, would sound exclusively in copyright. Because the narrow protections afforded under the Lanham Act do not, as a matter of law, extend to the interests Slep-Tone seeks to vindicate by and through its federal trademark claims, those claims cannot lie and should be dismissed with prejudice.

## II.    Slep-Tone's State-Law Claims

In the event the court adopts my recommendation to dismiss Slep-Tone's Lanham Act claims, the court could properly dismiss Slep-Tone's remaining claims (all of which are creatures of Oregon law) without prejudice for lack of federal subject-matter jurisdiction. *See* 28 U.S.C. § 1367(c)(3) ("[t]he district courts may decline to exercise supplemental jurisdiction over a [state-law] claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction"); *Carnegie-Mellon Univ. v Cohill*, 484 U.S. 343, 350 n.7 (1988) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of the factors to be considered under the pendent jurisdiction doctrine--judicial economy, convenience, fairness, and comity--will point toward declining to exercise jurisdiction over the remaining state-law claims").[6] Here, however, in light of the fact (discussed in more detail below) that most of the reasoning set forth above in connection with the Lanham Act claims is applicable with equal force to the Oregon trademark and passing-off claims, and the fact that the Section 20.080 (and/or Section 20.082) claim stands or falls with the merits of the substantive claims (likewise discussed in more detail below), the *Carnegie-Mellon* factors of judicial economy and convenience mitigate in favor of retaining jurisdiction over the state-law claims for the purpose of determining the merits of defendants' motion to dismiss.  I therefore do not recommend summary dismissal of the state-law claims for lack of federal subject-matter jurisdiction.  Instead, for the reasons set forth below, I recommend that the state-law claims be dismissed with prejudice on their merits.

---

[6] This court lacks diversity jurisdiction over Slep-Tone's action in that Slep-Tone prays for only $10,000 in damages, less than the minimum threshold for diversity jurisdiction. *See* 28 U.S.C. § 1332.

Page 20 - FINDINGS AND RECOMMENDATION

A.      **Slep-Tone's State-Law Trademark and Passing-Off Claims**

Oregon statutory law provides that:

(1)      A person may not:

        (a)      Use without the registrant's consent and in connection with a sale, distribution, offer for sale or advertisement of goods or services a reproduction, counterfeit, copy or colorable imitation of a mark registered under this chapter if the use is likely to cause confusion or mistake or to deceive as to the origin of the goods or services; or

        (b)      Apply a mark described in paragraph (a) of this subsection to a label, sign, print, package, wrapper, receptacle or advertisement intended for use in connection with the sale or distribution of goods or services within this state.

(2)      A person that acts as described in subsection (1) of this section is liable for the remedies provided in ORS 647.105 in a civil action brought by the registrant, except that the registrant may not recover profits or damages from the person unless the person acted as described in subsection (1)(b) of this section with the intent to cause confusion or mistake or to deceive.

Or. Rev. Stat. 647.095.[7]

For the same reasons discussed above in connection with Slep-Tone's Lanham Act claims, defendants' conduct does not contravene Oregon's statutory trademark infringement law. That is, defendants' "use" of Slep-Tone's registered marks was not "in connection with a sale, distribution, offer for sale or advertisement of goods or services," but rather was in connection with the public performance of Slep-Tone's derivative karaoke tracks.  The fact that defendants derived indirect economic benefit from that performance does not make the performance a sale, distribution, offer for sale, or advertisement.  Defendants' complained-of conduct is not actionable under Section 647.095.

---

[7] A civil action for the violation of a private litigant's rights under Section 647.095 is available under Or. Rev. Stat. 647.105.

Page 21 - FINDINGS AND RECOMMENDATION

Under Oregon common law, "'[i]mplied passing off' occurs when someone uses a picture or sample of its competitor's product, intentionally impliedly representing that its product is that of its competitor." *Classic Instruments*, 73 Or. App. at 745. Again, defendants' complained-of conduct does not contravene Oregon's passing-off law, in that nothing in Slep-Tone's allegations could support the conclusion that defendants are in any sense in competition with Slep-Tone in the production, marketing, or sale of karaoke CDs, or that the presence of Slep-Tone's trademarks at the beginning of each track or the display of Slep-Tone's trade dress throughout each track could suggest to defendants' customers that the tracks were defendants' products rather than Slep-Tone's. Moreover, the Oregon courts treat "[p]assing off [a]s a form of unfair competition, McCarthy, *Trademarks [and Unfair Competition]*, § 25:1 D. [(2d. ed. 1984)], that has been held to be a violation of section 43(a) of the Lanham Act," *id.* (some citations omitted), such that the merits of Slep-Tone's common-law passing-off claim must stand or fall with the merits of its federal Section 43(a) claim.

**B.      Slep-Tone's State-Law Attorney-Fee Claim**

Oregon statutory law provides that in any tort action in which the damages asserted are $10,000 or less, the prevailing claimant is entitled to award of attorney fees:

> In any action for damages for an injury or wrong to the person or property, or both, of another where the amount pleaded is $10,000 or less, and the plaintiff prevails in the action, there shall be taxed and allowed to the plaintiff, at trial and on appeal, a reasonable amount to be fixed by the court as attorney fees for the prosecution of the action, if the court finds that written demand for the payment of such claim was made on the defendant, and on the defendant's insurer, if known to the plaintiff, not less than 30 days before the commencement of the action or the filing of a formal complaint under ORS 46.465, or not more than 30 days after the transfer of the action under ORS 46.461. However, no attorney fees shall be allowed to the plaintiff if the court finds that the defendant tendered to the plaintiff, prior to the commencement of the action or the filing of a formal

> complaint under ORS 46.465, or not more than 30 days after the transfer of the action under ORS 46.461, an amount not less than the damages awarded to the plaintiff.

Or. Rev. Stat. 20.080(1). Oregon law makes similar provision for contract or implied contract claims in which the asserted damages are $10,000 or less. *See* Or. Rev. Stat. 20.082. Because, for the reasons discussed above, Slep-Tone cannot recover from defendants on its trademark claims, Slep-Tone's claim under Section 20.080 (and/or under Section 20.082) necessarily fails.

## CONCLUSION

For the reasons set forth above, defendants' motion (#13) to dismiss should be granted, each of Slep-Tone's claims should be dismissed with prejudice, and a final judgment should be prepared.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 4th day of September, 2014.

Honorable Paul Papak
United States Magistrate Judge

Page 23 - FINDINGS AND RECOMMENDATION